UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARGARET WARD, et al.,

    Plaintiffs,

v.

THE COUNTY OF MENDOCINO, et al.,

    Defendants.

Case No. 17-cv-0911-PJH

**ORDER GRANTING MOTION TO DISMISS**

The motion of defendant Marvin Trotter, M.D., to dismiss the claim of deliberate indifference to serious medical needs asserted against him in the second amended complaint ("SAC") came on for hearing before this court on October 25, 2017. Plaintiffs appeared by their counsel Nathaniel M. Leeds, and Dr. Trotter appeared by his counsel Chad C. Couchot. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion as follows.

## BACKGROUND

This case is brought under 42 U.S.C. § 1983 by the survivors of Earl Ward, who died while in custody of the County of Mendocino, California. Named as defendants are the County of Mendocino; Thomas Allman, the Sheriff of Mendocino County, and two Sheriff's Deputies – Michael Grant and Lorrie Knapp; California Forensic Medical Group, Inc. ("CFMC" – a company that provides and manages medical services in jails, including the Mendocino County Jail); and two physicians – Dr. Michael Medvin and Dr. Trotter.

Plaintiffs allege that Mr. Ward, a 77-year-old man suffering from dementia, "which

made him prone to confusion and uncontrollable rages," was arrested on March 20, 2016, following a call by his wife to the Sheriff of Mendocino County. SAC ¶ 1. He was held in custody at the Mendocino County Jail, where he exhibited signs of confusion and disorientation. SAC ¶¶ 1, 24-31.

Plaintiffs allege that the Mendocino County Jail does not have its own medical staff, or any advanced medical diagnostic or treatment facilities. SAC ¶ 13. Instead, the County has a contract with defendant CFMG, which provides that CFMG will supply a physician to be at the jail 8 hours in every 7-day period, and will identify a "responsible physician" who is on call the remainder of the time; that CFMG will supply a "Health Service Administrator/RN" to be at the jail 40 hours a week (not including any time on weekends); that CFMG will supply a "Psych/RN/LCSW/MFT" to be at the jail 40 hours a week (with no provision for weekends); and that CFMG will provide a psychiatrist via telepsychiatry "up to 8 hours a week." SAC ¶ 13.

On Saturday, April 2, 2016, Deputy Knapp allegedly observed Mr. Ward standing on his bunk, and then falling backwards, "possibly hitting his head." SAC ¶ 32. Early in the morning of Sunday, April 3, 2016, Mr. Ward was "observed to have a bruise on his head with dried blood," and was taken to the Ukiah Valley Medical Center ("UVMC") at 3:40 a.m. SAC ¶ 35. Upon arriving at UVMC at 4:14 a.m., Mr. Ward was seen in the emergency department ("ER") by Dr. Brandon Begley, who "believed that Mr. Ward was suffering from acute delirium" and recommended that he be admitted to the hospital. SAC ¶ 41. Dr. Begley allegedly consulted with Dr. Devies Leslee, a "hospital-based physician affiliated with UVMC," who agreed to admit Mr. Ward at approximately 5:30 a.m. on April 3, 2016. SAC ¶ 42.

Plaintiffs assert that by agreeing to admit Mr. Ward as a patient, the "UVMC hospitalist group," of which Dr. Trotter and Dr. Leslee were both members, "voluntarily and knowingly agreed to provide Mr. Ward with medical services that were not available to him at the Mendocino County Jail, with full knowledge that Mr. Ward was an inmate at the jail." SAC ¶ 43.

2

Plaintiffs assert that Dr. Leslee noted that Mr. Ward was asleep during the examination (and that according to the deputies, he had not been sleeping at the jail), and that when he did wake up, he was not oriented to person, place or time. SAC ¶ 44. Hospital nursing staff allegedly assessed Mr. Ward as a "high fall risk." SAC ¶ 45. Blood tests revealed elevated BUN (which plaintiffs allege is a sign of dehydration and kidney failure). SAC ¶ 46.

However, plaintiffs assert, no one at UVMC diagnosed the cause of the elevated BUN level, and no psychiatrist evaluated him with a view towards medical management of his dementia. SAC ¶ 47. They also claim that no assessment was made of the risk that Mr. Ward would continue to decline if sent back to the Mendocino County Jail, or what measures should be taken after his discharge to ensure his future safety or to determine his future medical needs. SAC ¶ 47.

Plaintiffs allege that Dr. Trotter and Jennifer L. Graff, a nurse practitioner, "jointly" made the decision to discharge Mr. Ward back to the Mendocino County Jail. SAC ¶ 48. Ms. Graff allegedly prepared the discharge summary, which noted that "[p]atient does have dementia, recently residing in the jail, likely had an acute episode of delirium, probably due to lack of sleep, as it is reported that he had not slept for a week and a half prior to presenting to the emergency room." SAC ¶ 48. Plaintiffs assert that Dr. Trotter subsequently reviewed and signed off on the discharge summary prepared by Ms. Graff, although he did not see, meet with, or personally evaluate Mr. Ward at any point. See SAC ¶¶ 48-49.

Plaintiffs contend that "through Ms. Graff," Dr. Trotter "was aware that Mr. Ward had a heightened risk of future falls, had suffered a marked decline in cognitive function since being admitted to the Mendocino County Jail, that the cause of the decline had not been assessed by the appropriate health care providers, that the medical management of Mr. Ward's dementia and delirium had not been evaluated in light of this decline, and that Mr. Ward's position put him at risk of serious bodily injury." SAC ¶ 50.

Plaintiffs allege that notwithstanding the fact that he had this knowledge, Dr.

Trotter failed to independently evaluate Mr. Ward, or question Mendocino County Jail staff about what safety precautions were available at the jail, or participate in the coordination of Mr. Ward's care with jail staff so that appropriate safety measures could be put in place. SAC ¶ 51.

Plaintiffs allege that Dr. Trotter's "complete delegation" to Ms. Graff of his "responsibilities to ensure that the discharge of Mr. Ward to the Mendocino County Jail was medically appropriate" constituted deliberate indifference to the risk that Mr. Ward would at some point suffer further cognitive decline and physical injury, as well as indifference to Mr. Ward's need for further, ongoing, medical care for his dementia. SAC ¶ 52. Finally, plaintiffs contend Dr. Trotter acted under color of state law. SAC ¶ 64.

On April 16, 2016, 13 days after his discharge from UVMC, Mr. Ward was discovered lying on the floor of his cell at the Mendocino County Jail and was taken in for further medical evaluation, which revealed that he had multiple vertebral fractures and broken ribs, internal bleeding, a partially collapsed lung, and acute kidney failure. SAC ¶ 60. Mr. Ward's orthopedic injuries required surgery, which plaintiffs claim led to complications, and ultimately, to his death six weeks later on May 30, 2016. SAC ¶ 61.

Plaintiffs filed this action on February 23, 2017, and filed a first amended complaint ("FAC") on March 23, 2017, alleging four causes of action – a "personal capacity" Fourteenth Amendment claim of deprivation of life without due process of law, deliberate indifference to serious medical needs, and denial of medical care, which also includes a claim of violation of the right to be free from wrongful government interference with familial relationships, and right to companionship, society, and support (against Sheriff Allman, Deputies Grant and Knapp, CFMG, Dr. Medvin, and Dr. Trotter); a "supervisory liability" Fourteenth Amendment claim (against Sheriff Allman); and state law claims for elder abuse (against the County, Sheriff Allman, Deputies Grant and Knapp, and CFMG), and medical negligence and wrongful death (against CFMG, Dr. Medvin, and Dr. Trotter).

On July 14, 2017, the court issued an order granting Dr. Trotter's motion to dismiss the Fourteenth Amendment claim of deliberate indifference to serious medical

4

1 needs. The court found that the FAC did not allege facts sufficient to show that Dr. Trotter acted with deliberate indifference in his provision of medical treatment when Mr. Ward was brought into the hospital on April 3, 2016; and that there were no facts pled showing that any action by Dr. Trotter did was the cause of Mr. Ward's fall thirteen days later, which allegedly caused the injuries that resulted in his death following surgery.

The court also found that the FAC did not allege facts sufficient to create a plausible inference that Dr. Trotter acted under color of state law. The court noted the absence of any allegation that Dr. Trotter or UVMC had a contract with the County, or that Dr. Trotter owed a duty towards Mr. Ward apart from the duty imposed by the federal Emergency Medical Treatment & Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.

Further, the court found no facts pled showing that Dr. Trotter had any input into the decision to return Mr. Ward to the jail, or into the decision to place him in one cell as opposed to another cell; and no allegations that Dr. Trotter was involved in the administration of the jail; that Dr. Trotter's provision of emergency medical services resulted from the state's exercise of coercive power; that the state provided "significant encouragement" for the activity; or that Dr. Trotter operated as a willful participant in joint activity with the state.

The court granted leave to amend, to allow plaintiffs to add additional facts they had identified in their opposition to Dr. Trotter's motion, and to plead additional facts to correct the deficiencies identified by the court in the order. Plaintiffs filed the second amended complaint ("SAC") on August 14, 2017, alleging the same four causes of action against the same defendants – the County, Sheriff Allman, Deputies Grant and Knapp, CFMG, Dr. Medvin, and Dr. Trotter. Dr. Trotter now seeks an order dismissing the claim of deliberate indifference to serious medical needs, asserted in the SAC.

**DISCUSSION**

A.  Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). A

complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); see also In re Gilead Scis. Secs. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007) (citations and quotations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

B. Defendant's Motion

Dr. Trotter argues that plaintiffs fail to allege facts sufficient to show deliberate indifference to serious medical needs, or to show that he acted under color of state law in treating Mr. Ward.

Section 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. See Graham v. Connor, 490 U.S. 386, 393-94 (1989).

To state a claim under § 1983, a plaintiff must allege that a right secured by the Constitution or laws of the United States was violated and that the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Ketchum v. Alameda Cnty., 811 F.2d 1243, 1245 (9th Cir. 1987). The plaintiff

6

must also allege facts showing that "the defendant's conduct was the actionable cause of the claimed injury;" that is, the plaintiff must establish both causation-in-fact and proximate causation. Harper v. City of L.A., 533 F.3d 1010, 1026 (9th Cir. 2008) (citing Van Ort v. Estate of Stanewich, 92 F.3d 831, 837 (9th Cir. 1996)).

Under the Eighth and the Fourteenth Amendments, detainees are entitled to adequate medical care. Doty v. Cnty. of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Inadequate medical treatment rises to the level of deliberate indifference to serious medical needs only where a plaintiff can establish (1) that he/she had a serious medical need; (2) that defendants were subjectively aware of his serious medical need and deliberately failed to respond; and (3) that the harm plaintiff suffered was both the legal and proximate cause of defendants' indifference. Conn v. City of Reno, 591 F.3d 1081, 1095 (9th Cir. 2010).

1. Whether the SAC alleges facts sufficient to show deliberate indifference

Dr. Trotter argues that the SAC fails to state sufficient facts to show deliberate indifference to serious medical needs. He argues that there are no facts showing that he had the requisite culpability; that there are no plausible facts showing that Mr. Ward suffered an injury caused by Dr. Trotter's deliberate indifference; and that a supervisor cannot be found vicariously liable for a violation of constitutional rights.

First, Dr. Trotter contends that there are no facts showing that he had the requisite culpability. Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted). This is a two-step process. First, the inmate must show a "serious medical need" by demonstrating that failure to treat his/her condition could result in further significant injury of the "unnecessary and wanton infliction of pain." Jett v. Penner, 439 F. 3d 1091, 1096 (9th Cir. 2006). Second, the inmate must show that the defendant's response to the need was "deliberately indifferent," by alleging facts demonstrating both a purposeful act or failure to respond to the inmate's pain or possible medical need, and harm caused by the

7

indifference. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002).

Dr. Trotter argues that plaintiffs have not plausibly alleged that Mr. Ward had a serious medical need when he was brought into UVMC on April 3, 2016. He notes that when Mr. Ward was brought in, medical personnel ordered some blood tests, and he was treated and discharged the same day. The discharge note written by Ms. Graff stated that Mr. Ward had dementia, and that he "likely had an acute episode of delirium, possibly due to lack of sleep," and that he had been "on his bunk" when he "dozed off and fell." SAC ¶ 48. Dr. Trotter takes issue with plaintiffs' suggestion that because Mr. Ward had fallen on April 2, and because he had dementia, he was at high risk of falling again. See SAC ¶ 54. Dr. Trotter argues that having dementia and having previously fallen are not evidence of "serious medical need."

Dr. Trotter contends that even if having dementia and having previously fallen could be construed as "serious medical need," the SAC does not plead plausible facts showing that he was deliberately indifferent to such medical need. Plaintiffs allege that Dr. Trotter did not meet with or evaluate Mr. Ward, and that he did not meet or consult with Mendocino County Jail staff. SAC ¶¶ 49, 51. They also assert that in signing the discharge summary written by Ms. Graff, Dr. Trotter made a joint decision with Ms. Graff to discharge Mr. Ward from the hospital, SAC ¶ 48; and alternatively, that Dr. Trotter "delegated" his responsibility regarding the discharge of Mr. Ward to Ms. Graff, SAC ¶ 52.

Dr. Trotter argues that there are no facts sufficient to create a plausible inference that his limited role in Mr. Ward's treatment (signing the discharge summary) was done in conscious disregard of an excessive risk to Mr. Ward. He contends that absent any facts showing a serious medical need, or the requisite culpability for deliberate indifference, plaintiffs' claims against him should be properly characterized as claims of medical malpractice. He argues that mere negligence cannot create a constitutional right.

Second, Dr. Trotter argues that there are no plausible facts showing that any

8

deliberate indifference on his part caused Mr. Ward to suffer any injury. Dr. Trotter notes that in order to be liable under 42 U.S.C. § 1983, a defendant must cause the deprivation of one or more of the plaintiff's constitutional rights. Dr. Trotter asserts that there are no facts pled showing that the act of signing off on the discharge summary on April 3, 2016 was the proximate cause of Mr. Ward's fall on April 16, 2016, or his death on May 30, 2016.

Plaintiffs allege that Dr. Trotter's alleged deliberate indifference caused the deprivation of medical care for Mr. Ward, and the fall in his jail cell that eventually led to his death. See SAC ¶¶ 53-55. However, Dr. Trotter asserts, there are no facts alleged showing that he played any role in the decision to place Mr. Ward back in his cell at the jail, any role in the decision to place him in an "unsupervised cell," or any role in the decisions made with regard to his confinement at the jail or the conditions of that confinement.

Moreover, Dr. Trotter argues, allegations in the SAC show that Mr. Ward had access to medical care during the 13-day interval between his discharge from UVMC and the April 16, 2016, fall that resulted in the injuries that eventually led to his death on May 30, 2016. Dr. Trotter refers to the contract between CFMG and the County of Mendocino, and asserts that there were numerous opportunities for Mr. Ward to be seen and treated by healthcare providers at the jail during the 13 days between his release from UVMC and the fall that ultimately led to his death – which he argues breaks the chain of causation.

Third, Dr. Trotter asserts, a supervisor cannot be held vicariously liable for a violation of constitutional rights, but may be liable only if he/she was personally involved in the constitutional deprivation, or if there is a sufficient causal nexus between the supervisor's alleged wrongful conduct and the constitutional deprivation. Here, Dr. Trotter asserts, as alleged in the SAC, he did not personally see, evaluate, or treat Mr. Ward. He contends that plaintiffs' generalized allegations of UVMC's treatment of inmates and his limited role in Mr. Ward's care (signing the discharge summary that had

9

been prepared by Ms. Graff) fail to show that he (Dr. Trotter) was personally involved in any violations of Mr. Ward's or plaintiffs' constitutional rights.

In opposition, plaintiffs contend that the facts alleged in the SAC support the conclusion that Dr. Trotter was deliberately indifferent to Mr. Ward's medical needs when he discharged him back to "the same jail cell" in which he had previously injured himself. As an initial matter, they contend that Mr. Ward's medical needs were "serious" to the doctors who admitted him to the hospital, because failure to respond to those needs "could have" resulted in further injury.

Plaintiffs argue that Mr. Ward's condition and conduct were of serious medical concern. They contend that he was showing signs of serious cognitive decline in response to being held in custody – he had allegedly not slept in a week, and he was not oriented to place or time, and he was showing signs he was dehydrated. They also note that Mr. Ward had fallen once, and claim that his condition during the ER visit offered no reason to conclude he would not be a fall-risk in the future.

Second, plaintiffs argue that the SAC adequately alleges that Dr. Trotter was deliberately indifferent to Mr. Ward's fall risk and declining mental health. They contend that deliberate indifference can be established by alleging that the official has acted or failed to act despite his/her knowledge of a substantial risk of serious harm. They claim that because Mr. Ward had already suffered one fall, and because (as jail personnel reported) he was not sleeping, and because the lab reports indicated that he was dehydrated, and because the discharge summary that Dr. Trotter signed indicated that Mr. Ward was suffering from dementia, there was an obvious risk that Mr. Ward would suffer serious future harm, such that Dr. Trotter must have been consciously aware of that risk.

Third, plaintiffs assert that they do not need to plead facts showing that Dr. Trotter's deliberate indifference resulted in Mr. Ward's death, only that it "harmed" him. They appear to have abandoned their previous effort to argue that there was a causal connection between Dr. Trotter signing off on the discharge summary prepared by Ms.

10

1    Graff, and Mr. Ward's fall 13 days later, and his death a month and a half after the fall
2    (following surgery). In a new theory, loosely based on allegations in the SAC that Mr.
3    Ward "continued to suffer the pain . . . of being deprived [of] appropriate medical care for
4    his dementia and delirium, causing [him] disorientation, fear, and confusion . . . ," SAC
5    ¶ 53(b), plaintiffs now argue that rather than looking at the fact of the 13-day interval
6    between the time Mr. Ward was discharged and the time he fell in his cell on April 16,
7    2016, the court should focus on the harm Mr. Ward allegedly suffered "in the hours and
8    days after Dr. Trotter elected to discharge [him] back to jail."

9    At the time he was admitted to UVMC, Mr. Ward was described as suffering from
10   an "acute episode of delirium." Plaintiffs argue in their opposition that in "lay terms," this
11   means "he was going mad." Plaintiffs contend that "[m]adness is emotionally painful for
12   the person experiencing it, and the family members who observe it." Plaintiffs assert that
13   they cannot affirmatively allege that Mr. Ward's acute delirium could have been controlled
14   with proper medication because Dr. Trotter discharged Mr. Ward before the evaluation
15   Dr. Begley contemplated was undertaken. But, they argue, it would be "wrong" for the
16   court to "fault [p]laintiffs' inability to conjure a cure to Mr. Ward's madness," because so
17   holding would allow Dr. Trotter to "benefit from his own indifference."

18   The court finds that plaintiffs have not adequately alleged deliberate indifference to
19   serious medical needs. As an initial matter, the court assumes for the sake of argument
20   that Mr. Ward had a serious medical need on April 3, 2017, based on the allegations that
21   he was brought to the ER and was then briefly admitted to the hospital for further
22   evaluation, prior to being discharged.

23   However, with regard to whether Dr. Trotter was deliberately indifferent to Mr.
24   Ward's serious medical needs, it is undisputed that Dr. Trotter did not see or treat Mr.
25   Ward while he was at the hospital, and there are no facts alleged showing that Dr. Trotter
26   subjectively knew and disregarded an excessive risk to Mr. Ward's health and safety, or
27   that Dr. Trotter purposefully acted or failed to respond to Mr. Ward's pain or possible
28   medical need. Moreover, the SAC alleges no facts showing that Mr. Ward was not

11

evaluated or that his alleged episode of delirium and dehydration were not treated before he was released from the hospital.

At most, plaintiffs have alleged that Dr. Trotter was negligent in failing to see and/or evaluate Mr. Ward before he signed off on the discharge summary prepared by Ms. Graff. An inadvertent or negligent failure to diagnose a medical condition or to provide treatment to a prisoner, without more, does not state a constitutional deliberate indifference claim. Jett, 439 F.3d at 1096 (citing Estelle v. Gamble, 429 U.S. 97, 105 (1976)); see also Hutchinson v. U.S., 838 F.2d 390, 394 (9th Cir. 1988). Put another way, medical malpractice does not become a constitutional violation simply because the victim is a prisoner. Estelle, 429 U.S. at 106; see also Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (allegations of nothing more than a "difference of medical opinion" as to the need to pursue one course of treatment over another is "insufficient . . . to establish deliberate indifference").

In addition, plaintiffs must allege facts showing that Mr. Ward was harmed because of Dr. Trotter's deliberate indifference. Jett, 439 F.3d at 1096. Liability under § 1983 "arises only upon a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). A plaintiff alleging deliberate indifference in § 1983 actions must demonstrate that the defendant's actions were both "an actual and proximate cause" of his injuries. See Lemire v. Cal. Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir. 2013). Here, however, plaintiffs have alleged no facts showing any causal connection between any action taken by Dr. Trotter on April 3, 2016, and Mr. Ward's fall in his cell on April 16, 2016, or his death six weeks later on May 30, 2016.

In their opposition, plaintiffs attempt to get around this problem by suggesting that Dr. Trotter had some input into the decision as to whether Mr. Ward should be incarcerated and/or as to which jail cell he should be placed in. However, Dr. Trotter was not in charge of the jail or the Sheriff's Department, and there are no facts pled showing that he had any supervisory authority over the County or any ability or responsibility to direct the placement of a pretrial detainee in the custody of the County Sheriff.

As for the suggestion that the court should simply ignore lack of a causal connection between the discharge (or any action taken by Dr. Trotter) on April 3, 2016, and the April 16, 2016 fall, and should instead construe the allegations in the SAC as asserting that Mr. Ward was suffering from "madness" (as evidenced by his delirium and/or dementia), and as for plaintiffs' argument that the act of discharging Mr. Ward back into the custody of the Sheriff's Deputies constituted deliberate indifferent to his serious medical needs, the court finds that the allegations on which plaintiffs rely are conclusory, speculative, and unsupported by facts.

Specifically, these are the allegations that a result of Dr. Trotter's asserted deliberate indifference was "the pain . . . of being deprived [of] appropriate medical care for his dementia and delirium" which caused him "disorientation, fear, and confusion" which in turn "constituted emotional pain and suffering[;]" and that the ineffective treatment of the "dementia and delirium" was a "non-trivial contributing factor" in the April 16, 2016 fall and injuries that ultimately resulted in Mr. Ward's death (six weeks later, following surgery). SAC ¶ 53(b), (c).

Moreover, these arguments ignore the fact that Mr. Ward did not fall again after his discharge until April 16, 2016, and also ignore the fact that during that 13-day interval, there were medical personnel available at the County Jail, pursuant to the contract between the County and CFMG. Thus, if Mr. Ward's alleged "madness" worsened, he had access to medical care at the jail during that 13-day period, and if said medical care for an alleged serious medical condition was denied him, with the result that he fell in his cell and seriously injured himself (and ultimately died following surgery for his injuries), it was not Dr. Trotter's doing.[1]

---

[1] Plaintiffs' argument that Mr. Ward's pre-death pain and suffering is compensable is without merit, at least under the facts as alleged. The case plaintiffs cite, <u>Chaudhry v. City of L.A.</u>, 751 F.3d 1096 (9th Cir. 2014), held that California's prohibition against recovering pain-and-suffering damages, <u>see</u> Cal. Civ. P. Code § 377.34, does not apply in connection with a § 1983 claim, where the decedent's death was caused by violation of federal law. <u>Id.</u>, 751 F.3d at 1105. Here, plaintiffs have not alleged facts sufficient to show that Dr. Trotter caused Mr. Ward's death by some violation of federal law.

13

Finally, while plaintiffs concede that Dr. Trotter did not meet with or evaluate Mr. Ward at any point, see SAC ¶ 49, they have not addressed Dr. Trotter's argument that he did not prepare the discharge summary but was acting as the supervisor of the nurse practitioner who prepared it. A person deprives another of a constitutional right within the meaning of § 1983 if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do, which causes the deprivation of which the plaintiff complains. Leer v. Murphy, 844 F.3d 628, 633 (9th Cir. 1988).

Supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Iqbal, 556 U.S. at 676; see also Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir. 2014). "Each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Iqbal, 556 U.S. at 675; see also Lemire, 726 F.3d at 1074-75 ("Vicarious liability may not be imposed on a supervisor for the acts of lower officials in a section 1983 action."). That is, supervisory officials "cannot be held liable unless they themselves" violated a constitutional right. Iqbal, 556 U.S. at 683.

A supervisor may be liable only if he/she was personally involved in the constitutional deprivation, or if there is a sufficient causal nexus between the supervisor's alleged wrongful conduct and the constitutional deprivation. See Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013). Under the latter theory, supervisory liability may exist without overt personal participation if the supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation. Id.

Absent some causal connection between the alleged constitutional violation and the supervisor's own conduct – such as the supervisor's action or inaction in the training, supervision, or control of subordinates; or his/her acquiescence in the alleged constitutional deprivation; or conduct showing a reckless or callous indifference to the rights of others – supervisors cannot be liable for the constitutional violations of others. See Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000), cited in Lemire, 726

F.3d at 1075. Here, plaintiffs allege no facts sufficient to show that Dr. Trotter can be held liable for the actions of other hospital employees in connection with the discharge of Mr. Ward from the hospital.

> 2. Whether the SAC adequately alleges that Dr. Trotter acted under color of state law

In his second main argument, Dr. Trotter asserts that the SAC does not allege facts sufficient to show that he acted under color of state law. A person acts under color of state law if he "exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West, 487 U.S. at 49 (citation and quotation marks omitted). Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir. 1997).

By contrast, a private individual generally does not act under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980). Purely private conduct, no matter how wrongful, is not covered under § 1983. Ouzts v. Maryland Nat'l Ins. Co., 505 F.2d 547, 550 (9th Cir. 1974). There is no right to be free from the infliction of constitutional deprivations by private individuals. Van Ort, 92 F.3d at 835.

Private conduct is not generally considered governmental action unless "something more" is present. See Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835 (9th Cir. 1999). Courts have applied certain tests to identify whether there is "something more," including the public function test, the joint action test, the governmental compulsion test, and the governmental nexus test. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982); see also Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003).

For example, in West, the Supreme Court found that a physician under contract to provide healthcare services to inmates in a prison was acting under color of state law, although the Court also found that the existence of a contract was not the determinative factor; rather, the Court held, it is a physician's function within the state system, not the

15

precise terms of employment, which determine whether the physician's actions can be fairly attributed to the state. See id., 487 U.S. at 55-56. The defendant physician was found to be a state actor because "[i]n the state's employ, [he] worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated." Id. at 56-57.

Dr. Trotter contends that there are no facts pled in the SAC supporting the conclusion that he acted under color of state law, and asserts that none of the above tests supports a finding that he was a state actor. For example, he asserts, there is no allegation that he or UVMC had a contract with the County, and no plausible allegation that he owed a duty to Mr. Ward apart from his duty to any patient at UVMC. In addition, he argues, there are no facts pled showing that he had any input into the decision to return Mr. Ward to the jail, or the decision to place him in one cell as opposed to another cell.

In their opposition, plaintiffs contend that the facts pled in the SAC show that Dr. Trotter assumed a public function in the providing of medical services to Mr. Ward, and was thus a state actor. For example, plaintiffs allege that UVMC is 1.2 miles from the Mendocino County Jail, and is the only trauma center near the jail, and that the next closest is Lakeside Hospital, which is a private hospital approximately 30 miles from the jail. SAC ¶ 37. Plaintiffs assert that because of the limited medical services available at the jail, the jail staff were not qualified at 3:40 a.m. on April 3, 2016, to determine what Mr. Ward's medical needs were or whether he could be safely returned to the jail facility. SAC ¶ 38. Plaintiffs claim that because jail staff were unable to make an assessment about whether Mr. Ward could be safely housed in the jail, the County defendants and CFMC "delegated their Constitutional obligation to render appropriate medical care, and determine whether such care could be rendered within the Mendocino County Jail, to UVMC-affiliated medical staff, including Dr. Marvin Trotter." SAC ¶ 39.

Plaintiffs allege further that "[b]ased on the limited medical services available to

1  the Mendocino County Jail," and the absence of other emergency medical facilities in the
2  area, the above-described delegation of constitutional obligations was "common, known,
3  and done . . . with the express understanding of the UVMC-affiliated medical staff,"
4  including Dr. Trotter, or with an "implicit understanding based on a long-standing custom
5  and practice" that existed between UVMC, UVMC-affiliated medical staff, and the
6  Mendocino County Jail. SAC ¶ 40. Plaintiffs claim that UVMC-affiliated medical staff
7  "were aware of this practice," and "were aware that some portion of the monies earned
8  by UVMC-affiliated medical staff were earned voluntarily treating and evaluating inmates
9  from Mendocino County Jail." SAC ¶ 40.

Plaintiffs argue that the fact that Mr. Ward was admitted to the hospital is significant because it shows that the UVMC hospitalist group "voluntarily agreed" to provide Mr. Ward with medical services, "fully aware that he was a criminal detainee." They argue that the allegation that Mr. Ward was admitted to the hospital completely obviates any obligation Dr. Trotter might have had under EMTALA. Rather, they assert, the treatment rendered by Dr. Trotter was pursuant to the "voluntary assumption of the duty to render care" attendant to Dr. Leslee's decision, on behalf of the UVMC hospitalist group, to admit Mr. Ward.

Similarly, plaintiffs contend, Dr. Trotter "voluntarily assumed a state function" in discharging Dr. Trotter. They claim that because they have now alleged that Mr. Ward was not discharged from the ER, but rather from the hospital, where he was admitted for an evaluation, and that the discharge by Dr. Trotter occurred before the evaluation could be completed, they have pled facts sufficient to show that Dr. Trotter was a state actor under the "public function" test.

Plaintiffs also contend that the facts alleged show that it was Dr. Trotter's "exclusive decision" to return Mr. Ward to the jail cell. Plaintiffs appear to equate the decision to discharge Mr. Ward from the hospital with the decision to place him in a jail cell. They claim that Dr. Trotter had the "ability and obligation" to keep Mr. Ward in the hospital until he could be "safely discharged." They contend that "[d]ischarge requires

17

both an assessment of the patient's needs, and whether those needs can be served in the environment in which they are discharged to." In Mr. Ward's case, plaintiffs argue, "Dr. Trotter's role in assessing Mr. Ward's fitness to return to jail was coextensive with the state function of determining whether, and how, Mr. Ward could be safely held in custody."

The court finds that the SAC does not adequately allege facts showing that Dr. Trotter was a state actor. Dr. Trotter is a private individual – not an employee of Mendocino County or an agent of the County. Private conduct is not covered under § 1983. Van Ort, 92 F.3d at 835. "Action by a private party . . . without something more, [is] insufficient to justify a characterization of that party as a 'state actor.'" Lugar, 457 U.S. at 938. Of the tests used to determine whether a private entity has acted under color of state law, see id.; see Johnson, 113 F.3d at 1118, plaintiffs argue only that Dr. Trotter was a state actor because he assumed a "public function."

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Kirtley, 326 F.3d at 1093 (citation and quotation omitted); see also Lee v. Katz, 276 F.3d 550, 554-55 (9th Cir. 2002). The scope of the public function test is relatively narrow, and the test is satisfied only on a showing that the function at issue is "both traditionally and exclusively governmental." Kirtley, 326 F.3d at 1093; Lee, 276 F.3d at 555.

It is undisputed that providing medical care to prison inmates and pretrial detainees is a governmental function. Blum v. Yaretsky, 457 U.S. 991, 1011 (1982); see also West, 487 U.S. at 56. A private physician or hospital that contracts with a public prison system to provide treatment for inmates performs a public function and acts under color of law for purposes of § 1983. West, 487 U.S. at 57 n.15; see also Lopez v. Dep't of Health Servs., 939 F.2d 881, 883 (9th Cir.1991). Here, however, unlike in West and Lopez, there are no allegations that Dr. Trotter performed any medical duties at the Mendocino County Jail, and no allegations that either UVMC or Dr. Trotter entered into

any contractual agreement with Mendocino County to provide medical care to its inmates. Rather, as alleged in the SAC, Mendocino County entered into a contract with CFMC to provide medical treatment at the jail.

Plaintiffs' "public function" argument fails because there are no facts alleged showing that Dr. Trotter was delegated a public function by the County of Mendocino. The mere act of taking Mr. Ward to UVMC for an evaluation after he was observed at the Mendocino County Jail with blood and a bruise on his forehead was insufficient to constitute a delegation of the governmental duty to provide medical care to inmates.[2]

The allegation that on April 3, 2016, "jail staff were not able to able to make an assessment about whether Mr. Ward could be safely housed in the jail," SAC ¶ 39, is pure speculation, and is not supported by facts alleged elsewhere in the SAC – that the Deputies took Mr. Ward to UVMC because he had a bruise and blood on his head, SAC ¶ 35. Further, the allegation that in being unable to make this "assessment," the County defendants "delegated their Constitutional obligation to render appropriate medical care, and determine whether such care could be rendered within the Mendocino County Jail, to UVMC-affiliated medical staff," SAC ¶ 39, is also pure speculation. There are no facts alleged showing such a delegation on the part of the County defendants.

With regard to plaintiffs' contention that Dr. Trotter assumed an essential state function by determining whether Mr. Ward could continue to be safely housed in the jail,

---

[2] Nor is plaintiffs' position supported by Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816 (7th Cir. 2009), a case on which they heavily rely. In that case, the Seventh Circuit found that a hospital that declined to treat the prisoner-patient did not operate under color of state law, but that a hospital that did treat him was a state actor. Id. at 831. However, the plaintiff alleged that he was placed in a "prison ward" of the second hospital – which indicated that the hospital "had an ongoing relationship with prison authorities for care of prisoner-patients in need of hospitalization" – and that he remained in that ward for a period of several days. The court found that these allegations were sufficient to show that the plaintiff's treatment was "tied to the state's responsibility for his overall medical care," even though it also found that no claim was stated against the hospital because the plaintiff alleged no facts showing that the hospital had any policy or procedure of deliberate indifference. Id. Here, plaintiffs allege that Mr. Ward was examined in the ER, and was briefly admitted to the hospital for evaluation, and was discharged the same day. There are no facts showing any connection between UVMC and/or Dr. Trotter and the County.

19

there are no facts pled in the SAC showing that Dr. Trotter had any duty, authority, or ability to make a decision to return Mr. Ward to his jail cell, or to determine whether Mr. Ward should be held in custody at all.

If anything, it was Dr. Trotter's duty as the supervisor of Ms. Graff, the nurse practitioner, to assure that her recommendation for Mr. Ward's discharge from the hospital was appropriate. Plaintiffs allege no facts showing that the discharge was not appropriate, and indeed, the fact that the fall that resulted in the injuries that ultimately led to Mr. Ward's death did not occur for nearly two weeks after he was returned to the jail counters any claim that he was not stable at the time of discharge from UVMC.

## CONCLUSION

In accordance with the foregoing, the court GRANTS the motion. Because the court finds that further amendment would be futile, and because plaintiffs have already been provided an opportunity to amend this claim, the Fourteenth Amendment deliberate indifference claim against Dr. Trotter is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: November 1, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge