UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARGARET WARD, et al.,<br>　　Plaintiffs,<br>　　v.<br>THE COUNTY OF MENDOCINO, et al.,<br>　　Defendants. | Case No. 17-cv-00911-PJH<br><br>**ORDER GRANTING MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT**<br><br>Re: Dkt. Nos. 128, 129 |

Defendant Kindred Healthcare Operating, Inc.'s ("Kindred") motion for a determination of good faith settlement came on for hearing before this court on February 13, 2019. Plaintiffs filed a statement of non-opposition but did not appear at the hearing. Kindred and defendant Kathy Louise Goodman (together, the "Kindred Defendants") appeared through their counsel, Matthew Schroeder. Defendants the County of Mendocino, Sheriff Thomas D. Allman, Michael Grant, and Lorrie Knapp (together, the "County Defendants") appeared through their counsel, Denise Billups-Slone. Defendants California Forensic Medical Group Inc. ("CFMG") and Dr. Michael Medvin (together, the "CFMG Defendants") appeared through their counsel, Jerome Varanini.

Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS Kindred's motion, for the following reasons.

**BACKGROUND**

This is a case brought by the survivors of Earl Ward ("Ward"), a 77-year-old man who was taken into custody by the Mendocino County Sheriff's Department following a

call to the police by his wife, Margaret Ward. See Third Amended Complaint ("TAC"), Dkt. 59 ¶ 1. He was arrested on March 20, 2016, and held in custody at the Mendocino County Jail, where he fell in his cell and suffered numerous injuries. Id. ¶¶ 1, 57. Following surgery, he was housed in a residential care facility, Magnolia Manor. There, he was cared for by Goodman, an employee of Kindred. Ward died on May 30, 2016, following surgery for his injuries. Id. ¶¶ 1, 68. Plaintiffs assert four claims: (1) § 1983 Fourteenth Amendment;[1] (2) § 1983 Supervisor Liability;[2] (3) elder abuse;[3] and (4) wrongful death based on medical negligence.[4] See id.; Dkts. 39 & 51 (granting motions to dismiss claim one against Dr. Marvin Trotter); Dkt. 77 (granting motion to dismiss claim three against Kindred); Dkt. 115 (granting defendants' motions for summary judgment with respect to claim four against Dr. Trotter and claim three against Goodman).

Defendant Kindred now moves for a determination that its settlement with plaintiffs and Goodman was made in good faith under California Code of Civil Procedure § 877.6. The CFMG Defendants and the County Defendants oppose a good faith determination.

**A.  Factual Background**

Prior to his arrest, Ward allegedly suffered from dementia, "which made him prone to confusion and uncontrollable rages." TAC ¶ 1. While in custody, he allegedly displayed symptoms of confusion, delusion, agitation, and paranoia (id. ¶¶ 27–29), which plaintiffs claim was immediately evident to jail staff. On March 21, 2016, he became agitated, hitting the window in his cell and saying he wanted to die, and later repeatedly pushing on the door of his locked cell. Id. ¶ 27–29. On March 22, 2016, he was observed standing at the door smiling, and again trying to push out; three hours later he was observed staring at the wall, holding a drinking cup on his head; and an hour later he

---

[1] Brought against Knapp, Grant, Sheriff Allman, CFMG, and Dr. Medvin.
[2] Brought against Sheriff Allman.
[3] Currently alleged against the County of Mendocino, Knapp, Grant, Sheriff Allman, and CFMG.
[4] Currently alleged against CFMG, Dr. Medvin, Goodman, and Kindred.

2

was observed by a jail staffer to have a "disorganized thought process." Id. ¶ 29. On March 24, 2016, a social worker from the U.S. Department of Veterans Affairs medical services observed that Ward was unable to articulate why he had been arrested. Id. ¶ 30. On March 28, 2016, jail staff noted that he refused to take his medications. Id. ¶ 31. That same day, a social worker from VA medical services spoke with Ward and noted that Ward indicated he was in Chicago. Id. ¶ 32. On April 2, 2016, a jail deputy observed Ward standing on his bunk trying to push the window open. Id. ¶ 33. Later that day, another deputy observed Ward standing on his bunk and falling backwards, possibly hitting his head. Id. ¶ 34.

On April 3, 2016, at 3:40 a.m., after jail personnel observed that Ward had a bruise on his head with dried blood, he was taken to the Ukiah Valley Medical Center, where he was seen in the Emergency Room ("ER"). Id. ¶ 37. Medical center staff noted that Ward remained asleep during the exam, and stated that he was not oriented to person, place, or time. Id. ¶ 41. The deputies stated that it was the first time he had slept since March 20, 2016. Id. ¶ 41. Blood tests showed he had an elevated blood urea nitrogen, which plaintiffs assert is a sign of dehydration and renal failure. Id. ¶ 43. Dr. Trotter subsequently supervised and approved a nurse's recommendation to discharge Ward from the ER. Id. ¶ 45. He approved a report stating that Ward "does have dementia, recently residing in the jail, likely had an acute episode of delirium, probably due to lack of sleep, as it is reported he had not slept for a week and a half prior to presenting to the emergency room." Id. ¶ 45. Plaintiffs claim that upon his return to the jail, Ward continued to exhibit agitation, confusion, and delusion, and repeatedly attempted to climb out of a fixed window. Id. ¶ 53.

On April 16, 2016, Ward was discovered lying on the floor of his cell and was taken for further medical evaluation, which revealed that he had multiple vertebral fractures and broken ribs, internal bleeding, a partially collapsed lung, and acute kidney failure. Id. ¶ 57. Ward underwent surgery on April 22, 2016 at Santa Rosa Memorial Hospital ("SRMH") and was discharged to the care of Magnolia Manor on May 18, 2016.

3

Id. ¶¶ 58–59.

Defendant Kathy Goodman cared for Ward at Magnolia Manor in the scope of her employment with defendant Kindred. Id. ¶ 60. She cared for Ward's surgical wounds during the time that he was a resident of Magnolia Manor, which entailed daily wound dressing changes and notifying doctors if Ward had any wound redness/bleeding and/or drainage from the surgical site. Id. ¶ 61. From May 21, 2016 to May 26, 2016, plaintiffs allege that Goodman observed that Ward's wound was increasingly draining, that his pain was increasing, and that the wound site had increased in diameter. Id. ¶¶ 62–64. Plaintiffs allege that Goodman did not inform doctors of any of these events, even though the physician ordered he be notified of those events, and Goodman instead used products to dress Ward's wounds that were not ordered by the physician. Id. ¶¶ 61, 65.

On May 23, 2016, someone from Magnolia Manor called SRMH and reported that Ward was suffering from anxiety and his "sutures may be infected," but refused SRMH's attempt to schedule Ward for a trauma clinic appointment because Magnolia Manor did not transport residents. Dkt. 102 at ECF p. 10.

Goodman wrote that she visited Ward on May 24, the wound was cleaned with normal saline/wound cleaner, and it was covered with bordered gauze. Dkt. 101 at ECF pp. 21–22. She noted that Ward tolerated the dressing change without pain or discomfort and that Ward had pain scaled at two out of ten in his legs. Id.

Goodman wrote that she visited Ward on the morning of May 26, 2016 and used a wound cleanser and covered the wound with gauze. Id. at ECF pp. 23–26. Later that day, Ward arrived at the SRMH emergency room with a suspected wound infection, urinary tract infection, and wound dehiscence. Dkt. 102 at ECF pp. 14–24.

On May 27, 2016, physicians at SRMH determined to proceed with surgery to repair the wound dehiscence. Id. at ECF p. 25. Ward died on May 30, 2016 due to complications of sepsis, MRSA, wound infection, and spinal fusion procedure. Id. at ECF p. 62 (Death Certificate).

The parties do not dispute that plaintiffs' economic damages total $18,025.63 for

4

1 Ward's funeral expenses, the Magnolia Manor bill, requests for reimbursement from
2 Ward's wife, and various miscellaneous expenses. See Dkt. 128 at 7.

### B. The Settlement

The TAC had alleged claims against the Kindred Defendants for elder abuse and medical negligence. On May 4, 2018, the court granted Kindred's motion to dismiss the elder abuse claim. Dkt. 77. Plaintiffs were granted leave to amend, but they did not do so. On September 24, 2018, the court granted Goodman's motion for summary judgement on the elder abuse claim. Dkt 115. Following those orders, only plaintiffs' fourth claim, for wrongful death based on medical negligence, remained pending against Goodman and Kindred.

On October 2, 2018, the parties attended a mandatory settlement conference with Judge Beeler. See Dkt. 116. At that settlement conference, plaintiffs reached a settlement agreement with the Kindred Defendants.

On October 29, 2018, the Kindred Defendants moved for a determination of good faith settlement. Dkt. 119. The court denied that motion without prejudice because California law required the Kindred Defendants to share the written settlement agreement with co-defendants who opposed their motion, and they had not done so. Dkt. 126. The settling parties had also not provided the agreement to the court. On January 7, 2019, Kindred filed a motion for determination of good faith settlement—the instant motion.[5]

The settlement agreement provides that all plaintiffs agree to dismiss their claims against Goodman and Kindred (and affiliated non-parties) in consideration for payment of $165,000. Dkt. 129-1. That sum shall be paid via check "within three weeks of Defendants' counsel's receipt of this signed release, signed W-9, and the signed order determining the good faith of the settlement." Id. ¶ 2.

---

[5] Kindred's attorneys filed the motion on Kindred's behalf but not on behalf of Goodman because they believe that Goodman died at some point after the settlement agreement was entered into. The parties argue about the impact of Goodman's death on the present motion—and about whether Goodman is in fact dead—but whether or not Goodman is alive today does not impact this court's analysis as to whether the settlement agreement was entered into in good faith.

# DISCUSSION

**A. Legal Standard**

Pursuant to California Code of Civil Procedure §877.6, any defendant may file a motion for a determination that its settlement with a plaintiff is in "good faith." Federal courts in diversity cases have the power to apply "good faith" settlement provisions under California Code of Civil Procedure §§ 877 & 877.6. Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC, 632 F.3d 1056, 1060 (9th Cir. 2011).

California Code of Civil Procedure §877.6 provides in relevant part:

> (b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response, or the court may, in its discretion, receive other evidence at the hearing.
>
> (c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.
>
> (d) The party asserting the lack of good faith shall have the burden of proof on that issue.

Cal. Civ. Proc. Code § 877.6.

Such a motion calls for the court to determine whether a settlement is made in good faith and is "within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." Tech-Bilt, Inc. v. Woodward-Clyde & Assocs., 38 Cal. 3d 488, 499 (1985). The court considers the following to make the determination: a rough approximation of the plaintiff's probable total recovery and the settlor's proportionate liability; the amount paid in settlement; the allocation of the settlement proceeds among plaintiffs; the recognition that a settlor should pay less in settlement than he would if he were found liable after a trial; the financial condition and insurance policy limits of the settling defendant; and the existence of collusion, fraud, or tortuous conduct aimed to injure the interests of nonsettling defendants. Id. at 499.

"This is not to say that bad faith is established by a showing that a settling

1  defendant paid less than his theoretical proportionate or fair share. Such a rule would
2  unduly discourage settlements. For the damages are often speculative, and the
3  probability of legal liability therefor is often uncertain or remote. . . . Moreover, such a
4  rule would tend to convert the pretrial settlement approval procedure into a full-scale
5  minitrial." Id. (internal citations and quotation marks omitted). "As Tech-Bilt emphasizes,
6  of course, a 'good faith' settlement does not call for perfect or even nearly perfect
7  apportionment of liability. In order to encourage settlement, it is quite proper for a settling
8  defendant to pay less than his proportionate share of the anticipated damages. What is
9  required is simply that the settlement not be grossly disproportionate to the settlor's fair
10 share." Abbott Ford, Inc. v. Superior Court, 43 Cal. 3d 858, 874–75 (1987).

"Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. A defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be. The party asserting the lack of good faith, who has the burden of proof on that issue, should be permitted to demonstrate, if he can, that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute." Tech-Bilt, 38 Cal. 3d at 499–500 (internal citations and quotation marks omitted).

**B.    Analysis**

    **1.    The MICRA Cap Applies to Plaintiffs' Medical Negligence Claim**

Section 3333.2 of the California Civil Code, part of the Medical Injury Compensation Reform Act ("MICRA"), provides in relevant part:

> (a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.
>
> (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000).
>
> (c) For the purposes of this section:

7

>  . . . .
>
>  (2) "Professional negligence" means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

Cal. Civ. Code § 3333.2.

Plaintiffs allege that Goodman, in her capacity as a nurse caring for Ward, failed to care for Ward's wound properly or report its condition to a doctor. It is undisputed that she did so while rendering professional medical services to Ward. Thus, Section 3333.2 applies on its face to plaintiffs' claim for medical negligence against the Kindred Defendants. See David M. v. Beverly Hosp., 131 Cal. App. 4th 1272, 1277–78 (2005).

The County Defendants argue that the $250,000 MICRA damages cap does not apply to plaintiffs' claim.[6] As an initial matter, plaintiffs have not alleged a claim for medical negligence against the County Defendants. In fact, there are no overlapping claims alleged against the County Defendants and the Kindred Defendants. Nevertheless, the County Defendants argue that the MICRA damages cap does not apply because plaintiffs either could or inadvertently did bring a claim for an intentional tort not subject to the MICRA damages cap against the Kindred Defendants. But plaintiffs have a single active claim against the Kindred Defendants—medical negligence—which is not an intentional tort.[7] See TAC; see also Dkt. 137 at 2, 5–6. Based on the present record, the court concludes that the MICRA damages cap applies to the Kindred Defendants' potential liability.

---

[6] The CFMG Defendants do not dispute that the MICRA damages cap applies. Plaintiffs also argue that the MICRA damages cap applies to their claim for medical negligence.
[7] In any event, the evidence presented by the County Defendants to demonstrate that Goodman committed an intentional tort is unpersuasive, and they accordingly have not met their burden of proof on the issue. See Cal. Civ. Proc. Code § 877.6(c). The court DENIES Kindred's objections to the County Defendants' and CFMG Defendants' requests for judicial notice, Dkt. 135-8. Additionally, Kindred's objection to the Blanton Declaration, Dkt. 135-7, is DENIED as moot, as the records objected to are cumulative and would not alter the court's analysis.

8

### 2. The Settlement Was Made in Good Faith

The court considers the Tech-Bilt factors to determine whether the settlement was made in good faith and is "within the reasonable range of the settling tortfeasor's proportional share of comparative liability[.]" Tech-Bilt, 38 Cal. 3d at 499.

The court first compares a rough approximation of the plaintiffs' probable total recovery with the settlor's proportionate liability, considering the amount paid in settlement and recognizing that a settlor should pay less in settlement than he would if he were found liable after a trial. Those factors support a good faith finding. Plaintiffs' claim for wrongful death based on medical negligence, if taken to trial, would allow recovery of non-economic damages capped at $250,000 in addition to economic damages. No party contests that plaintiffs have identified $18,025.63 in economic damages. Therefore, plaintiffs can recover at maximum $268,025.63 for their medical negligence claim at trial. The plaintiffs and Kindred Defendants have entered into a settlement agreement for $165,000, or 61.6% of plaintiffs' maximum potential recovery for their negligence claim at trial. Put another way, the Kindred Defendants could face at most an additional $103,025.63 obligation (assuming the jury found the CFMG Defendants bore no liability for the negligence claim) by trying the case before a jury rather than settling the action before the close of discovery. See Dkt. 118 (discovery ends May 11, 2019).

Considering that "it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages," the settlement would be reasonable even if the record suggested that the Kindred Defendants were overwhelmingly liable for plaintiffs' medical negligence claim. See Abbott Ford, 43 Cal. 3d at 874–75. But the information available at the time of settlement does not indicate that the Kindred Defendants are alone liable for the medical negligence claim. Rather, the record suggests that the CFMG Defendants are likely to bear a non-negligible share of liability based on their conduct while Ward was held in custody. The CFMG Defendants do not argue otherwise. They explain at length how Goodman's culpability is "shocking and dramatic" (Dkt. 132 at 5–9)—and the settlement reflects that. But the absolute nature of

1 Goodman's actions is not determinative. The court must assess the defendants' relative
2 liability, and the CFMG Defendants have not met their burden to show that their own
3 liability is so negligible that a settlement with the Kindred Defendants before the close of
4 fact discovery for over 60% of their maximum potential liability at trial is disproportionate
5 to their relative liability.

The next Tech-Bilt factor, the allocation of the settlement proceeds among plaintiffs, is not at issue because the settlement calls for a single payment to all plaintiffs through a trust fund. See Dkt. 129-1 at 1. The financial condition and insurance policy limits of the settling defendants do not weigh on the analysis, because there is no indication that settling defendant Kindred has any such hardship. Finally, there is no indication of collusion, fraud, or tortuous conduct aimed to injure the interests of non-settling defendants.

### 3. Motion to Seal

Kindred moves the court to seal the portion of the settlement agreement that discloses the settlement amount. Dkt. 129. It argues that public disclosure of the settlement amount would undermine the confidential nature of the settlement negotiations and that the parties agreed to keep the amount confidential.

There is a general presumption in favor of public access to federal court records. "[T]he proponent of sealing bears the burden with respect to sealing. A failure to meet that burden means that the default posture of public access prevails." Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1182 (9th Cir. 2006).

When a request to seal documents is made in connection with a motion, the court must determine whether the parties are required to overcome that presumption with "compelling reasons" or with "good cause." A party seeking to seal materials submitted with a motion that is "more than tangentially related to the merits of the case"—regardless whether that motion is "technically dispositive"—must demonstrate that there are compelling reasons to keep the documents under seal. Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1101–02 (9th Cir. 2016).

A contested motion for a determination of good faith settlement requires the court to assess the amount of the settlement in light of the merits of the case and the parties' proportionate liability (among other factors). Such a motion is directly related to the merits of the case and therefore requires compelling reasons to seal attached materials. Cf. Huang v. Gemmy Indus. Corp., Case No. 17-cv-02731-PJH, Dkt. 34 at 4 (N.D. Cal. Sept. 5, 2018) ("When a good faith determination motion is unopposed, the court need not consider and weigh the Tech-Bilt factors. . . . when unopposed, such a motion is only tangentially related to the merits of the case.").

"In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets. The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." Kamakana, 447 F.3d at 1179 (internal citations and quotation marks omitted). Moreover, the mere fact that the parties' proposed settlement agreement contains a confidentiality provision does not constitute a compelling reason to seal the information. E.g., Select Portfolio Servicing v. Valentino, Case No. 12-cv-0334-SI, 2013 WL 1800039, at *3 (N.D. Cal. Apr. 29, 2013); Bernstein v. Target Stores, Inc., Case No. 13-cv-01018-NC, 2013 WL 5807581, at *3 (N.D. Cal. Oct. 28, 2013).

After the court finds a compelling reason to seal, "[t]he court must then 'conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret.'" Ctr. for Auto Safety, 809 F.3d at 1097 (internal quotation marks omitted).

The court assumes without deciding that Kindred has presented compelling reasons to narrowly seal the dollar amount of the settlement.[8] The court next balances

---

[8] Kindred's request is narrowly tailored, as it requests to seal only the dollar figure paid in settlement. See generally Civ. L.R. 79-5(b).

11

the "public interest in understanding the judicial process and whether disclosure of the material could result in improper use of the material[.]" Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 679 n.6 (9th Cir. 2010); see also Ctr. for Auto Safety, 809 F.3d at 1097.

The present motion hinges on whether the dollar amount of the settlement is fair and reasonable. Accordingly, this court's analysis turns entirely on the magnitude of the settlement payment. This order would be incomprehensible—and would provide the public with no additional understanding of the judicial process—if the dollar amount of the settlement were redacted. There would be no way of knowing whether the parties settled for 60% or 6% of what plaintiffs might recover for their negligence claim at trial.

Kindred argues that (1) routine disclosure of settlement amounts might make parties, including Kindred, less willing to settle in the future, (2) the parties agreed that they wanted the information to be kept confidential, and (3) the settlement amount may mislead the public about Kindred's liability in this case or their settlement positions in other cases. Dkt. 129 at 4–6. First, Kindred's worry about routine disclosure of settlement amounts is misplaced. Parties generally need not file their settlement agreements with courts at all. Here, Kindred seeks a judicial determination of good faith settlement, so it has elected to submit the settlement agreement to substantive, judicial review. Moreover, the compelling interest standard applies only because the good faith settlement motion is opposed. Accordingly, only a narrow set of settlements—that settling parties themselves elect to put at issue before a court—risk publication. Second, the fact that the parties wanted to keep the information confidential is not a compelling reason to keep it from the public. Third, while Kindred's interest in keeping the amount it pays to settle any case out of public view is understandable, that desire does not outweigh the public's interest in the substance of this order. Accordingly, Kindred's motion to SEAL is DENIED.

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, Kindred's motion for a determination of good faith settlement is GRANTED. Kindred's motion to seal is DENIED.

**IT IS SO ORDERED.**

Dated: February 22, 2019

_____
PHYLLIS J. HAMILTON
United States District Judge